Good morning, your honors. May it please the court, my friend, Mr. Gray. I'm Kevin Colliner from the U.S. Attorney's Office in South Dakota here on a rare mission for a government attorney, and that's we're asking that this court agree with my office and with the Solicitor General's office that this is one of those... It's rare since Gaul. I'm sorry? It's only rare since Gaul. Well, and that's certainly the case, and one of these rare cases where we're here asking the court to agree with us that this is one of those cases that deserves to be reconsidered because of the unreasonably low sentence. Your honors, whenever there's a murder, there's a tragedy, and certainly a murder of an innocent child is in a category all its own. Darwin Red Cloud pleaded guilty to second-degree murder here. He admitted that his conduct amounted to federal second-degree murder. When a court is required to craft a sentence in a case like this, it's appropriate to undertake the very process that the district court did here, to consider the defendant as an individual, to set aside biases, to consider a variety of circumstances. And that sort of careful, thoughtful approach is why my office is very often before this for the reasonableness of the sentences imposed by this very district court, often in cases involving, sadly, very similar tragedies. But at times, mistakes are made, and in that process, critical facts can be ignored, root causes of crimes go unconsidered, clear errors of judgment... It takes more than a mistake, though, right? It takes abuse of discretion. It takes an abuse of discretion. A mistake sounds to me like an error. This is beyond error, right? Clear error is the standard on that certain factor, so... I'd say abuse of discretion, right? A clear error of judgment. Oh, I'm sorry, you're doing the parts of it. Go ahead, sure. This is one of those cases. We are not here asking to change the law in any respect. We're not asking for floodgates to be opened, for the government to rush in every time we're dissatisfied with a sentence. The briefing has raised questions in terms of whether Mr. Red Cloud was sufficiently different from other child abuse or murder defendants that passed before the same district court. The briefing asks whether certain factors were ignored or overemphasized, whether the court read certain aspects of Dr. Ertz's forensic report correctly. All important details to consider, but what I would ask the court to ask itself when assessing this case respectfully is that when Mr. Red Cloud was sentenced to 48 months in prison for the murder of his child, when he was sentenced to a sentence so low that he walked out of BOP custody just four and a half months after his sentencing, is this the defendant and are these the circumstances that warrant the lowest federal murder sentence on record? What do you say by on record, counsel? That's not in your brief. You take a pretty big appendix to your brief. Well, in our reply I think we did say that this would be without, that affirming this would make this sentence stand alone. My research has uncovered no cases that have a second degree federal murder sentence this low. Defense counsel's brief has cited none. The lowest sentence for a second degree murder that I found in this circuit was in United States v. Deegan. That was 121 months. That's cited in our reply brief. And these are reported cases you're referring to? That's right. That's 121 months and that involved much different, much more sympathetic circumstances. That's the case involving a deeply troubled young woman who committed an act called neonaticide, which the expert testimony in that case indicated was a product of a lifetime abuse and severe mental health condition. I submit this defendant was not nearly as sympathetic as that defendant. And that sentence was six years longer than the sentence in this case. I did locate a case from the Tenth Circuit. I submitted it in a last minute 28-J letter. I again apologize to the court that it was so late. But I thought it was important to point out because it involved a similarly situated defendant. He had a juvenile co-defendant. She gave birth to a child. He was 18 at the time and they killed the child just after birth. Tragic case. It involved violence in a way this case did not. He was found to be, in the clinical term used by the court, was borderline mentally retarded. That places him in a different category than this defendant. His guideline range was also lower, 168 months to 210 months, lower than Mr. Red Cloud's. There was not a discussion. Well, they overlap. They overlap. At the high end and the low end. Go ahead. And frankly, it's not discussed in that opinion. But I think the difference was a vulnerable victim enhancement was applied here where it wasn't. May not have been in that case. There was not a discussion of substance abuse in that opinion. One takes from that Tenth Circuit opinion that it was an act of desperation undertaken by an individual with diminished capacity. About two years longer, that sentence. Seventy months. Again, here the picture is much less sympathetic. Mr. Red Cloud was found to have low average intelligence. An important point. His IQ was 85. In some ways, he tested out higher than his completed grade level. Reading comprehension score over grade 12, he dropped out of school after the 10th grade. No indication this was an act of desperation. It was a child starving to death while his father was more interested in abusing substances. That's the elephant in the room. But is that the way the district court saw it? That sort of either or. Either I take care of my child or I engage in substance abuse and abuse. It seemed a little more complicated than that. That this was a case of tragic neglect and that there was tragedy spread all around. Well, Your Honor. The whole household in terms of who could have supported, who wasn't supporting, what assumptions he was making about what it meant to have a child. Right. And I'm just wondering about that binary sort of decision making process that you've presented. I just didn't see that as one of the findings from the district court. I don't want to reflect that it's a binary decision making process. It's a totality of the circumstances. And district courts allowed to look at a variety of different factors. What was ignored in this case was substance abuse. That was utterly unmentioned by the district court. Except in terms of supervised release. Supervised release. And then it was talked about as an issue of therapy. I mention that in particular because to me that's the elephant in the room. That was unmentioned by the court at sentencing. This was an individual who in the IRTS report details really an adolescence and young adulthood just committed to abusing substances. There was discussion that he was intoxicated much of the time. He was searching for substances other times. But when this child was born, he was denied access to the hospital because he was too intoxicated. Was there evidence presented that his substance use and abuse was connected to the neglect? And if whatever the answer to that is, does that matter? Well, when we look at the case of Darshan Featherman, which was one of the cases the court compared this to, very similar in terms of substance abuse. There it was treated by the court as an aggravating factor. In terms of the same district court's discussion, the court talked about how the use of substances led to the neglect of the children. It's hard to view this picture and not imagine how it could not have led to this neglect of this child. Now, in terms of the family that was there in the house, in the defense sentencing memorandum and also in Mr. Red Cloud's admissions, in the IRTS report and the pre-sentence report, it was admitted that these two individuals, the juvenile mother and Mr. Red Cloud, were the two that were caring for these children, and that the others in the house were not involved in the child care, only to the extent of changing an occasional diaper and so forth. So this is an individual who had been arrested, I think, upwards of 30 times for alcohol and drug-related offenses, all sorts of admissions in the IRTS report about the ravages of alcohol and substance abuse in his life, including suffering withdrawal symptoms at a young age of age 20, like tremors and things of that nature. So that, in terms of the factors that this court is to look at, were there relevant factors that should have received significant weight? That's the first factor. Alcohol and substance abuse, virtually ignored. That has been treated by this district court and other like cases, and also, of course, by the sentencing guidelines, as a factor that should not be a mitigating factor but an aggravating factor because of the propensity for substance abuse to lead to crime. The second factor that this court should look at is whether there were significant weight given to improper factors. The other glaring mistake, I believe, in the record of this district court, was the emphasis placed upon the supposed cognitive impairment of this defendant. Now, I've already mentioned that the IQ test tested out at an 85, but I think if the court looks at that IRTS report in detail, what they'll find is a young man who tested low average on many of the different subtests, higher than average on certain subtests. What the finding, the low average tests, by the way, were on things like... Counsel, Dr. Ernst said, quote, significant impairments in cognitive development, right, unquote? Because of below average scores and things like verbal comprehension. Boy, doesn't the expert guide here. It can't be wrong for the district court to agree with the expert. Well, and there was no objection to the expert report being used in this case. But when you dive into those subtest reports, what you have here is an individual with a language-based learning disability. That's what Dr. Ernst determined because reading comprehension at a high level but verbal processing at a lower level, and he found that the disconnect between those seemingly related test results is usually indicative of someone with a language-based learning disability. To contrast, by the way, with the juvenile co-defendant, there was a question in the sentencing of why the sentences were so different. Of course, she was adjudicated as a juvenile delinquent. She had an IQ of 54. No question that that's a level of cognitive disability. I do want to reserve some time for rebuttal unless there are any questions. I'll take my seat for now. Thank you. Gray? Good morning. I thank the court for its recognition. Counsel? Counsel, I imagine that every federal sentencing must be a very difficult decision for a district judge, and it probably only becomes all the more difficult under circumstances that are presented here where we're dealing with the death of a child. Our position is that Judge Viken properly weighed the sentencing factors, reviewed this case, and ultimately came to a reasonable sentence. Under these factors, there's no reason to remand for a different sentence. And I think, understanding, of course, that my primary duty here is to answer the court's questions, but I think the spot to begin is where Judge Viken... Let me begin with a question. I just did some rough math here, and it appears to me that the 48-month sentence is 77% below the bottom of the advisory range. The only... There hasn't been much discussion in the briefs about percentage ranges, and yet that was the basis for our decision in Dautovic, which was an 80% below the bottom of the range. So what percentage below the bottom of the range have you found that we have up... the biggest that we have upheld? Not... Any range? Not second-degree murder? Not 77%, Your Honor, as I stand before you. So I don't have... Give me one that's 50%. I just... This is what the Supreme Court in Gaul limited us to looking at. It said we had all the right analysis, but we overcooked the extent of the review, and we can... It is appropriate to require a greater explanation and stronger factors the further below the range you go, but don't look too much more closely than that. So the greater the variance, there better be a greater explanation for why there's such a great variance. Well, that was the holding. So in Dautovic, the court had all the right factors, but it failed to justify the extent of the variance. It seems to me that's the issue before us. As the Supreme Court has limited our role in reviewing sentencing... Correct. ...that strikes me as where we are, and so I'm sort of starting. What's the biggest downward you've found so that I can go read that and see how it was justified when we affirmed it? So I don't have a number-to-number type of case analysis for you. What I do have is the analysis of the particular facts of this case. This is Mr. Red Cloud's sentencing, not anybody else. Well, you don't even tell us which are big versus little variances in your brief. Give me one where we affirmed a big variance. Forget percentages. I know that this court has affirmed variances, but I don't have a good apples-to-apples, oranges-to-oranges comparison for you on this particular case. There's Dautovic, which as I recall is the officer under color of authority who is striking an innocent individual. This court said that that was ultimately too far. And I guess we would have Tom from the Tenth Circuit, although unreported, but the United States recently presented that case. But this is not a case that involved a wanton type of violence. This was a case, as the prosecutor at the trial level explained, was a runaway negligence. This is a father who with cognitive disabilities, according to the district judge, failed to provide for his child. And so the court then focused on the fact that the guideline range in this particular case for second-degree murder, that the statistical analysis behind that guideline was not helpful here because the conduct, and I'm using some different language than the district court, but the conduct of Mr. Red Cloud that he admitted to would not be in the heartland or what we would ordinarily consider when thinking of second-degree murder, which is why Judge Viken found this kind of conduct to be more akin to a recklessness as opposed to some of the other extreme conduct that we're seeing in several of the other cases. For example, in the Featherman case, where Judge Viken found that the parents, I'm sorry, that the caregivers were actively, or people in the home were actively trying to hide food from the children. There's a different type of conduct going on there than we have going on in this case. Now, I realize that that's a different type of analysis than me giving you a... What would the range have been had he pled to voluntary manslaughter? Without having a precise guideline calculation in front of me, I think we're going to be... But with all the same factors. But I think we're going to be probably closer to where Judge Viken found. But I don't have that guideline calculation in front of me. Which, then turning back to the issue, did Judge Viken abuse his discretion when he's going through and looking at these various factors? I think the analysis is, if we look at the case the way that Judge Viken found it to be, if we then turn our attention to what the prosecution or what the government's now looking for is aggravating factors, this is not a case where Judge Viken found, or where I found that the prosecution argued very vigorously, that someone was drunk in the corner of the entire two months that this child was alive and that's why someone passed away. This is not a case where we're talking about alcoholism or being drunk has a direct impact on the crime. For example, someone who's had numerous DUIs, then they're involved in a DUI accident that hurts somebody. In a case like that, certainly would be more of an aggravating factor to look at the history of somebody's alcohol use. But here, if we're looking at the offense conduct, even though it arguably could be an aggravating factor that someone has a history of alcohol abuse, it's not the same type of conduct that would warrant issuing a more extreme sentence in a case like this when viewed in the context of the entire case. The same analysis also applies to Mr. Red Cloud's criminal background. Although he has no convictions in federal court or in state court, he had arrests in tribal court. He had issues while he was at the jail. As the court was going through, I think it's a reasonable assumption for us to view that the court did not find those types of issues to be as relevant to this case because the former bad conduct is not similar in kind to failing to provide for a child. Being angry with the guard or spraying another inmate is not the same type of conduct as we are dealing with here at sentencing, and so therefore it's not going to be as relevant for determining an aggravating factor in a case like this. So when the judge is weighing these out and he's viewing Mr. Red Cloud and his issues being what's critical to determine why this crime occurred, that's how he came about fashioning the sentence. So is it your view that the district court did consider substance abuse and alcohol abuse but just gave it the appropriate amount of weight, or how would you respond to the argument that it did not consider it? Clearly the district court did consider it. Not only did the district court mention that he had prepared for sentencing on two separate occasions and spent hours reviewing the pre-sentence report and other materials, he also, of course, as you pointed out earlier, made that a specific sentencing condition to address Mr. Red Cloud's alcohol and other addiction issues. So clearly the court had those issues in mind when determining what the sentence should be. So I think the only question is, well, did he abuse his discretion by not weighing that factor heavily enough? And my simple answer would be, well, given the offense conduct, prior alcohol abuse is not going to be as relevant a factor. It's not an abuse of discretion to say that the other mitigating factors would outweigh this potential aggravating factor. The other important thing that Judge Viken found in this case, which may be different and distinguishable from the other cases where we've had the near death or the starvation death of a child, is the cultural differences. I understand the government's position. I've read their brief. I read the record a little differently. My understanding from Dr. Ertz's report and from what Judge Viken said from the stand is that in his experience, his 41 years on the bench, his understanding was that families from our Native American reservations historically or traditionally have been more of an extended family type unit. Mr. Red Cloud. This strikes me as reverse ethnic discrimination. Is that something that's permissible for district courts in sentencing? Reverse in the, you know, I can discriminate in sentencing because, taking substance abuse for an example, there's so much alcohol abuse on the reservation that you rarely see a crime where it isn't at least a minor factor. Now, is that permissible under our society's views of discrimination? And the direct answer is of course it's not. But that's not. So then why are we talking about cultural differences? I mean, it's a reality. I guess you can't ignore it. But is it something that is properly an explicit irrelevant sentencing factor? And so my answer to the question would be its use in this case was not as a factor in the traditional sense in which it would be improper. It's used in this case because Judge Viken's trying to understand why the crime occurred. Part of Mr. Red Cloud's cultural background would be the extended family unit. But in his particular case, that's not something that he had. Did Dr. Ernst use the term, quote, cultural differences, unquote? I don't believe he did. Because the district court does begin the whole litany with cultural differences pointed out by Dr. Ernst. What was he talking about? So as I read that, and my understanding is that there's now been a breakdown in certain cultural areas. So in Mr. Red Cloud's case, in the pre-sentence report, what occurred, his father wasn't there for him. I'm trying to talk about Dr. Ernst. What did Dr. Ernst say that pointed it out to the district court? It's the first words I think the district court says. I could be wrong, but I think I'm right. Pointed out by Dr. Ernst. What did Dr. Ernst point out that are cultural differences? That's what I'm asking. He didn't use the term cultural differences. What's the district court talking about in Dr. Ernst's report? So my understanding is Dr. Ernst, who the court knows very well and has reviewed numerous reports from, is talking about in traditional Lakota culture, you've got the extended family, and that's something that Mr. Red Cloud did not receive. He did not get that type of, I hesitate to use the word, training. No, that's in black and white in Dr. Ernst's report. Right. And that's what I believe that Judge Viken is going off of. And, of course, he's not, as Judge Viken points out, he's not simply relying on what only Dr. Ernst has stated. He's also saying, in my 41 years working in this area, and even talks about his own culturally extended family. So then getting back to Judge Lawkin's question, what Judge Viken is doing is he's saying, all right, look, you have a young man who doesn't have that traditional cultural extended family. His father wasn't there. His mother essentially wasn't there. And it was a grandmother that came in to step in. And then later it was a sister that stepped in as more of that parental role. So when Mr. Red Cloud comes into at 21 or 20 years of age becoming a father, he doesn't have that traditional model. He's now in a different type of environment, which is very frequent on the reservation, unfortunately, where you don't have the traditional parental figures being present. However, there are other people in the home. And so although Judge Viken didn't use the words detrimental reliance, he's looking at a household here where you have other people that are helping to care for the child to some degree. And so you've got this very, as Judge Viken describes it, tragic family dynamic that Mr. Red Cloud has come up in. And now he's here in this household. And so does he have the best equipped background to be prepared to raise this child? No, he does not. Is that a defense? No. That's why Mr. Red Cloud pled guilty and that's why he's being sentenced and why he received a 48-month sentence was to address the culpability of his actions. And what Judge Viken was trying to do was to assess not only the factual basis in the situation but also Mr. Red Cloud's specific characteristics so he could arrive at what a just sentence would be under these circumstances. So our position simply stated is we might do something different on appeal. There are certainly other cases. But Judge Viken used his discretion properly, carefully reviewed the record, went through everything that was before him, had the firsthand opportunity to see Mr. Red Cloud in person to determine that he found him to be sincere when he said that he accepted responsibility, found that these facts were deviant from the other cases that he had worked on. And in trying to fashion the just punishment for these aberrant circumstances, he did not find the guidelines to be useful because these facts were different than what you would typically associate with second-degree murder. And so he therefore went forward, giving credibility to Dr. Ertz's report and fashioned the best sentence that he thought was reasonable under the circumstances while accounting for what the prosecution is now pointing out as aggregating factors. And so I thank the court for its attention on behalf of Mr. Red Cloud and we would ask that the court affirm Judge Viken's use of his discretion in this matter. Thank you. Thank you, Mr. Gray. And the court notes that you are accepted appointment under the Criminal Justice Act and we appreciate your help. Thank you. Colonel Burwell. Thank you, Your Honor. Addressing the question, Judge Benton, that you asked about Dr. Ertz's report and what he says about traditional methods, it's on page 12 of the report. One of the bullet points he says, absent models for adequate child care, traditional culture methods related to raising children have often been identified as being destroyed in American Indian population. But then he goes on to say, and I believe this is the important point, neither Darwin nor his son's mother appear to have been exposed to these child care techniques for different reasons. Why I believe that's important is I think what Dr. Ertz is saying is that traditional child care methods have been destroyed. In other words, if they had been in place and this child had received the care that traditional child care methods in this culture would have provided, we wouldn't be here today. But they have been destroyed generally. But nonetheless, this defendant wasn't subjected to traditional child care methods. So it's sort of not a part of his background, even though if it had been and had they not been destroyed, it would have made him a better father. I guess I read it as because these traditional child care methods have been destroyed, and I think the implication is been destroyed by other cultures, because they're not there, he did not have those at his disposal. And he was not able to rely on these traditions that would have otherwise provided him and his partner the support. In your honor, I think that's a more artful way of trying to say what I was trying to say, and I think what Dr. Ertz would agree with you. That's not what Judge Viken took from that, though. If you look at the sentencing transcript, he took from that that because of Mr. Red Cloud's cultural influences, he was somehow less culpable as a father caring for a child. Maybe we're all saying it a little inartfully, but I feel like we're all saying the same thing. I guess I didn't see that as a direct contradictory statement in relying on the report, but maybe that's just a matter of interpretation. Thank you, and it may be. And I think no one's accusing anyone of being discriminatory here, and Judge Loke and I would like to speak to your question about whether these factors can be considered at all. And I would commend to the Court the Seventh Circuit's opinion in United States v. Guzman. We've cited it in our reply brief. But there the Court discusses this very question. Can we consider factors like a defendant's ethnicity, his place of birth, socioeconomic status, and whether those are relevant to determining a sentence? And the Sentencing Commission says no. There's a policy statement on that directly, 5H1.10. So what about the federal law that says a sentencing judge should be deprived of no information in making the decision? Is that statute in conflict with what the Sentencing Commission has said? It's a difficult question because I'm often here, of course, saying that a sentencing judge can look at all aspects, and I certainly believe that to be true. And that's what the statute says. But this is a question about whether there are certain sort of off-limits things. I'll tell you the Seventh Circuit's reasoning, which I think makes some sense. One of the things they say is, for instance, if you consider a defendant's cultural heritage for crimes like, especially like this one, that involve a family member victim, it strips an entire class of victims of the protection of federal law. What does that mean for children growing up in the Pine Ridge Indian Reservation like this child here? It means that if we consider the cultural devastation and the factors like poverty and so forth as a mitigating factor for defendants, it strips children of those protections. Your Honors, I'm out of time. I appreciate very much your attention to this case. We ask for remand and a reconsideration of this sentence. Thank you. Thank you, counsel.